And we'll move to the next case for oral argument, which is 20-1514, Vengalattore v. Cornell University et al. Mr. Kruckenberg. Thank you, Your Honor. Caleb Kruckenberg for Dr. Moken Vengalattore. Dr. Vengalattore was a well-respected tenure-track professor with a major scholarly output, until he was the victim of gender and racial discrimination through a rigged disciplinary process. After asking a graduate student to leave his lab for court performance, the student swore to a faculty member that she would make sure Dr. Vengalattore had a hard time getting tenure. Years later, after his peers recommended him for tenure, the student made good on her promise and made an unsupported complaint of sexual impropriety five years after the alleged incident. Dr. Vengalattore was funneled into a disciplinary process that was designed to result in punishment for male students and faculty, and even then not provided with the limited protections that were set out by that policy. Dr. Vengalattore was never given an explanation of the charges, much less access to the evidence against him, while his accuser was provided with an advisor who actively worked with the investigators to revise the student's statements in light of other accounts. The investigators also ignored testimony provided by other students that the accuser had a history of making false accusations and racially and sexually charged statements. When much of that testimony came from male students of Indian descent, Cornell ruined Dr. Vengalattore's career by branding him as a sexual abuser through a system tainted by racial and gender discrimination. The district court's dismissal here would eliminate all of Title IX's protections against gender discrimination from an entire class of persons employed by educational institutions. Never mind the Supreme Court's approval of a private Title IX claim brought by an employee of a school and the decisions of at least four other circuit courts. And the court ignored the clear deviations from applicable policy that gave rise to an inference of gender and racial discrimination in the disciplinary process. The district court also ignored the overwhelming force of the Department of Education's action to undermine basic procedural protections for those accused of sexual misconduct on college campuses. Finally, the court wrongly concluded that the Department of Education could not bear any responsibility for its unlawful campaign to remove basic protections for accused students and faculty. These errors warrant reversal so that this case can move forward to discovery. And, Your Honors, I welcome any questions from the bench. Thank you, Mr. Krockenberg. I'm going to ask my colleagues momentarily to put some questions to you, but I have a simple threshold question. Could you summarize what the procedural irregularities are in the process that Cornell afforded to your client? Well, Your Honor, there were a number of them. And one of the most glaring procedural irregularities was the fact that the investigators ignored the applicable limitations period. The policy said very clearly that it was applicable for acts that had occurred within a year. And here there was an investigation into something that had allegedly happened five years earlier. In addition, the policy made it very clear that Dr. Vengelator was entitled to notice of the specific accusations against him. He was entitled to see the evidence presented against him. And he was also entitled to present testimony and evidence in his own favor. And he repeatedly posed questions and evidence for the investigators to consider, and they ignored it. In addition, the policy said that no party, whether the accuser or the accused, is guaranteed any sort of advocate, any sort of faculty advisor or attorney. But here there was a special advisor appointed only to the accuser and denied to Dr. Vengelator. Now, all parties were notified, were they not, that the university was proceeding under the romantic relationship policy? Well, that is not entirely accurate. And to the extent that Cornell has argued now that there was a separate policy other than policy 6.4, that is a factual dispute. And again, here this is simply on a motion to dismiss. But the record shows a number of instances where Cornell invoked policy 6.4, not the separate faculty sexual relationships policy. And just sort of as a threshold, I'll note that the sexual relationships policy that Cornell is invoking now, it's not a procedure. It's simply a policy. That document is just a couple of pages long. The procedure, though, is set out in policy 6.4. And as we indicated in the complaint, and that's at joint appendix page 69, policy 6.4 says specifically that it applies to allegations of sexual impropriety against faculty, just the same as it does to students. And in fact, the investigators invoked policy 6.4. They did so in e-mails. They did so in the final report. They said this is in accordance with policy 6.4. Judge Kears, any questions for Mr. Korkenberg? No questions. Thank you. Judge Pooler? I have no questions. Thank you. All right. So you reserve two minutes. Oh, no, you have more time, Mr. Korkenberg. Why don't you finish? Yes, Your Honor. And I just want to highlight probably the most important issue before this court today. And that's the right, the private right of action for Title IX. And the district court did not reach the merits. It didn't have anything to say about whether or not Title IX claim was adequately pled. And instead, the district court said that a faculty member, as opposed to a student, is not allowed to sue under Title IX, no matter what. And that is simply inconsistent with the statute and inconsistent with the law. And as we note in our brief, the most important case on that is, comes from the Supreme Court itself, the Jackson case, where the Supreme Court recognized that there is a Title IX private right of action for a coach at an educational institution for retaliation. And certainly the Supreme Court would not say that if there was not more generally a right, a private right of action for faculty under Title IX. And all of the courts that have considered that case, that have considered this issue after Jackson, have concluded that it is clear from that decision that there is a right of action for faculty. Well, how did Judge Sharp deal with this issue that you're raising now? Well, Judge Sharp ruled the other way. And he said that there was no private right of action because there's a Title VII general remedy for employment discrimination more broadly. And Judge Sharp concluded that because there was another remedy available, he could not imply a cause of action. And that reasoning was rejected by the Supreme Court when it established the private right of action in Gannon in the first place. The Supreme Court said just because there's other remedies doesn't mean that there's not a remedy under Title IX. And it makes a lot of sense when you look at Title IX versus Title VII because Title VII applies more broadly to all employment situations. Whereas Title IX, of course, applies in educational context. And so on scrutiny, the district court's reasoning doesn't withstand scrutiny. It doesn't hold up. Now, is it possible? Our circuit has never, in your view or in Judge Sharp's view, recognized the existence of a private right of action for sex discrimination under Title IX for employees? Is that the case? So this court in the SUMA decision recognized the issue in a footnote and ultimately did not issue a binding holding in that case. But to our knowledge and to the district court's knowledge, there's never been a published decision in this court. But it's something I think in some ways that's because it's been so obvious. And there certainly have been other cases where faculty have raised or employees of educational institutions have raised Title IX claims that haven't been dismissed. It's just I believe that this is the first time that this has presented itself squarely for this court's review. And certainly given this uncertainty, at least in the district courts, within the Second Circuit, it sort of begs out for a decision now. And other circuits have acted on this question. Is that right? Yes, Your Honor. And the only circuit that has ruled the other way is the Fifth Circuit. And as we note in our brief, that was before the Jackson case was issued. That was before the Supreme Court recognized the Title IX action for a coach. And as the Third Circuit noted in the Doe case in 2017, after the Supreme Court issued the Jackson decision, there's really no basis whatsoever to make a special carve-out in Title IX just for employees of an educational institution. And, Your Honor, just with the remainder of my time, I want to briefly touch on the Title VI issue. And while Cornell never argued below that the complaint failed to state a claim under Title IX, the district court dismissed the Title VI national origin discrimination complaint for failure to state a claim. And that was error, particularly with reference to this court's decision in the Menneker case and also in Doe v. Columbia. And as I know this court is aware, Menneker talked very extensively about the inference of discrimination from procedural irregularities. And certainly we have those here, as I've indicated earlier. But we have more here. And specifically with regard to national origin discrimination, it is extremely noteworthy that several students came forward to defend Dr. Bengelator and to say specifically that the student who made the accusation had said racially derogatory things or racially insensitive things to them and had made sexually suggestive statements to them despite repeated requests to stop. And not only did the investigators disregard those statements entirely and take no action against the student who made the accusation in the first place, but they disregarded those students' accounts entirely, just because it didn't fit with the narrative brought by the accuser. And I think there is a strong inference of national origin discrimination when you have students of Indian descent coming forward saying, this student made derogatory comments towards me because of my Indian descent. And their statements are disregarded entirely. And Dr. Bengelator, as we know, is of Indian descent. And I think that does raise an inference, certainly for pleading stages, that there is national origin discrimination. And so together, we just urge this court to remand this case just so this case can go forward to discovery. And, Your Honor, I yield the rest of my time. Let me ask a final question. You're asking us to infer by the exclusion of these statements from these other students, these South Asian students, that racial bias is a substantial or motivating factor. Is that right? It is, Your Honor. And this is a totality of the circumstances kind of an issue because not only do we have the procedural irregularities, which give rise to both kinds of discrimination, but we have the investigators are ignoring these comments. And also, as we point out, in the parallel tenure proceedings, another member of the faculty wrote in her evaluation that she believed that Dr. Bengelator behaved a certain way because of his national origin. And that information was, that review was sent to Dean Ritter. And Dean Ritter made both the tenure determination and the investigatory determination here. And having considered all this evidence, having considered those statements, Dean Ritter said nothing. She didn't push back at all. She didn't correct those statements. And instead, she found that the investigators were right to ignore the evidence and sustained the allegation. And I think collectively, that does raise an inference of national origin discrimination. Let me ask you about the proceedings before Judge Sharp. Were you counsel for the plaintiff in the matter before Judge Sharp? Yes, I was, Your Honor. Did you raise the question of discovery before you proceeded to the consideration of motions to dismiss? Yes, we did, Your Honor. Did you raise the question of that? I'm just trying to get a sense. Yes, Your Honor. And specifically in our moving papers, we requested, because procedurally what happened is the defendants filed an answer and a motion for judgment on the pleadings simultaneously. And an initial part of our argument was that this was premature. This case should go to discovery instead and not be decided at this stage. And Judge Sharp ultimately dismissed the case without allowing any discovery. All right, I'll come back later on the question of Cornell as a public or private institution. But let's hear from Mr. Banks. Your Honor, I have one question that I neglected to ask before. Can I take a moment? Sure, absolutely. Thank you. Counsel, you were citing to us the policy for non-consensual relationships. But wasn't it the policy on romantic relationships, romantic and sexual relationships that Cornell relied on? So as a factual matter, Cornell has asserted that there is some sort of other policy on sexual and romantic relationships that it applied here instead of policy 6.4. Was that a yes? Are you answering my question yes? Well, Your Honor, so that is the policy. That is ultimately what Cornell decided that Dr. Bengelator had violated. But that is not a procedure. That is just a policy, no different than any other restriction on an employee's behavior. You were citing to the policy for non-consensual relationships, and that's not what Cornell relied on. Isn't that correct? Well, originally Cornell did rely on the policy on non-consensual relationships because in the early part of the investigation, that was the original allegation. And ultimately, because that was time barred, Cornell decided that it was a consensual relationship. But again, even regardless of which policy is implicated, policy 6.4 is the process. And as the procedural policy, it says any allegations of sexual misconduct or sexual harassment should go through this policy. And as we also point out, if somehow the allegation doesn't fit under policy 6.4, Cornell is very clear that grievances against faculty have to go through a different policy, a policy through the school's bylaws. And that requires a hearing in front of the faculty, which certainly never occurred. So it is not accurate for Cornell to say, now, actually, we went on a different policy. It was outside of policy 6.4, and he got everything he was entitled to. Policy 6.4 is the policy on non-consensual relations. Is that right? Yes. Yes, sir. And that's the policy that was prompted by the Department of Education. Is that right? Yes, your honor. And that's the policy that was invoked ultimately by the investigators in their findings against Dr. Venglator. But don't Cornell say in their report here that they're in the complainant's report of sexual assault is analyzed only under the romantic and sexual relationships policy? Don't they say that? They do say that, your honor. But again, so again, the policy, right, the romantic and sexual relationships policy is not a process. It's not a procedure that they can go through. I understand the point you're making. Thank you. Yes, your honor. All right. Let's hear from Mr. Banks. Thank you. Thank you, your honors. This is Michael Banks for Cornell University. Mr. Kruckenberg opened with his first three minutes of argument contending that the investigation, which was conducted under the romantic and sexual relationship policy, was unfair or insufficient. As this court is aware, that issue has been resolved conclusively in the state court proceedings. Professor Venglator confirms in his brief that he's not challenging the denial of tenure. Instead, he's challenging the finding that he had a romantic relationship with a student for which he was suspended for two weeks. That is the sole adverse employment action that is at issue here. As this court knows, and I know from the questions just asked, there is a lengthy investigative report, a 65-page report that was prepared and given to Professor Venglator and his lawyer for review in draft form. That report was prepared after dozens of interviews and extensive reviews of records, including emails, computer records, medical records. The independent investigators found that Professor Venglator had a consensual relationship with the student. The dean accepted that finding and the suspension was imposed. In state court, Professor Venglator challenged the fairness of the investigation as well as the finding. He said the investigation was arbitrary and capricious, and the state court disagreed. It refused to expunge from his record the findings that he had violated the policy, yet that is exactly what counsel is arguing to this court, that there was some arbitrary and capricious and unfair investigation. Now, he adds to his claims in the federal court some new factual... I'm sorry, Your Honor. Yeah, well, soon as up to you have three minutes, and then we'll ask him questions. Okay, thank you. He adds new allegations that not only was it arbitrary and capricious, but it was based on gender and race. But the fact of the matter is he is challenging the same two-week suspension that he challenged in state court, and it's clear under principles of claim preclusion and issue preclusion, the Nevada versus U.S. case that we cite and the Paramount Pictures case that plaintiff cites, that the issue isn't just the allegations you make in the state court proceeding or the theories you rely on. The claim preclusion applies, and this is a quote from the Paramount Pictures case, to not only every matter which was offered and received, but any other admissible matter which might have been offered for that purpose. And that, Your Honors, is why the claim in this case falls apart. He could have argued, the professor could have argued in the state court, that the proceedings against him were not only unfair and arbitrary, but motivated by bias. For whatever reason, he did not make that factual assertion. Instead, he made more of, I guess what we'd call a procedural due process argument. But his decision not to present certain arguments or facts in support of his claim in state court does not change the reality that he now comes into federal court and asks to do the exact same thing he did in state court, or he tried to do in state court, which is to overturn the finding. And I'm sorry, Judge Cabranes, I got on a roll. I didn't mean to cut you off with the question you had. No, that's fine. Let me ask Judge Kearse if he has any questions for you. Judge Kearse? Have we lost Judge Kearse? Should we pause for a moment to give Judge Kearse a chance to return? Sure. Let's go to Judge Pooler. Judge Pooler, do you have any questions? I do not have questions at this time. Okay. Well, Mr. Banks, while I have you then, let me ask you about the state court decision. Yes, sir. That decision was only that the tenure decision was not arbitrary. No, Your Honor. Actually, that's... The written opinion discusses the tenure decision, but twice before both Justice Rich and Justice Morris, there were challenges to the disciplinary suspension by way of a request for expungement of the findings from the record. The finding that he had violated the romantic relationship policy. And twice that was rejected. First by Justice Rich, and then Justice Morris emphasized in rejecting it again that the plaintiff had a full and fair opportunity with representation of counsel to challenge that in the first round and had failed to do so. For whatever reason, Professor Vengelator did not appeal in the state court, just as he did not pursue a grievance procedure at the university level. He was advised when the report was issued and accepted by Dean Ritter that because this was a suspension of less than a semester, there was a procedure in place. He could have actually invoked a grievance procedure that is very, very detailed and has many due process type aspects attached to it, including an opportunity for a grievance hearing. He elected not to do that. We find ourselves today with two rounds of state court proceedings. Proceedings before the New York State Human Rights Division and now district court proceedings and up in the Second Circuit asking to go back to make the same challenge, to challenge the same adverse employment action that he unsuccessfully challenged in the state court. So I hope, Judge Cabranes, that addresses your question. I don't know if... The state court declined to address the misconduct finding, did it not? Well, I'm not sure what you mean by the misconduct finding. It did refuse to expunge the finding that he violated the romantic relationships policy. That was stated explicitly by Judge Morris, that the judge would not revisit that. He did not write an opinion, just as when a jury hears a case and enters a jury verdict, they don't write an opinion. But the decision and the judgment that is entered thereon is conclusive, regardless of whether there is an explanation for the judge's rationale or simply a judgment or final decision. I don't know if we have... I'm sorry. Judge Sharpe's treatment of the question of Cornell's status as a so-called private institution... As to whether... I'm sorry, Your Honor. Go ahead. As to whether a 1983 claim applies? Yes. The, you know... Cornell, for some purposes, certainly receives public fund and several of its colleges are deemed statutory colleges that have different attributes associated with them. First of all, this was the Arts and Science College, which was not one of the statutory colleges or state colleges, as they're sometimes called. But looking at this under state law and the question of has the state somehow imbued public status on them, we cite in our brief the New York Court of Appeals case, the Stahl v. New York State College of Veterinary Medicine case, which pointed out that certain decisions made by universities are not public in nature and don't trigger public regulation or statutes such as 1983. And among those decisions, and this is a quote from the Stahl case, are creating the academic curriculum, hiring faculty, maintaining discipline, and then it goes on. This is maintaining discipline. This is exactly what the New York Court of Appeals referenced as a non-public function of the university and within its private domain as an academic institution and employer. Cornell is New York's only land-grant university, isn't that right? It is a land-grant university. And that has no significance as to whether it's a private or public institution for these purposes? No, the land-grant is how the university was originally established and chartered in, I believe, the 1860s or so. I should know the year. I'm a Cornell graduate, but I don't know the precise year. But it doesn't deal with the question of whether its private colleges are deemed public for purposes of discipline that they impose on faculty members or other employees. All right. I don't know if Judge Kearse has been able to rejoin. I have been able to rejoin. Thank you. Thank you. I have no questions. I don't know if I have time perhaps to address one more point. I would be less than two minutes, but I didn't know with Judge Kearse's unavailability whether I might have that opportunity. Go ahead. Just one point in response to my opponent's argument about Title IX that I wanted to make very briefly. He says it is so clear and suggests that there are decisions going the other way. I would point out that there are four district court opinions in this circuit within the last five years now that all found Title IX does not support a private cause of action for employment discrimination, but notably, while he cites the SUMA decision from 2013 that Judge Pooler authored that declined to find a cause of action or declined to determine whether there was a private cause of action, did not answer the question of... I beg your pardon? I said that's correct. That we did not answer the question. But that was also the case just two weeks ago. Two weeks ago in the Gagliardi decision from this circuit, the court again declined, notwithstanding this supposed clear precedent that my opponent points to, to answer this question and instead chose to affirm a summary judgment entered below on alternative grounds without weighing into this difficult legal question on which the courts have now split. We submit that the implied cause of action that many of the older cases recognized as a basis for extending Title IX to a private employment discrimination claim would no longer fly in this circuit or before the U.S. Supreme Court, but notably, just again two weeks ago in Gagliardi, the court declined to go there. I submit that this court should be in the same place. The state court proceeding so clearly disposed of the sole adverse employment action that is being challenged by Professor Venglator, this is not a case in which the court needs to find an implied cause of action and create a new theory of relief that the Second Circuit has not recognized. It's kind of unusual that our circuit hasn't addressed this when, as you indicate, quite a few district courts have expressed a view on the matter. It may not be, if I may, Your Honor. The other circuits that have ruled on it are mostly decisions that are 20 to 30 years old. The Doe case, which the Third Circuit ruled on in 2017, is based on finding an implied cause of action. The Third Circuit says that. It says there's nothing in the statute that permits this. We're going to find an implied cause of action. As we note in our brief, both the U.S. Supreme Court and in recent years the Second Circuit have very clearly moved away from implied causes of action and said we should not strain statutes to find new theories. Now, the Cannon case extends that to educational programs. The Jackson case that my opponent cited extends that to a coach who was complaining about treatment of a girl's basketball team at a high school level, but to find a cause of action, you'd have to find an implied cause of action that is not in the words of the statute, and that's an expansion of the Supreme Court. Counsel, I'm sorry. I'm going to interrupt, Counsel. I beg your pardon? I'm going to interrupt, Counsel. You suggested that all the cases that find a cause of action under Title IX are 20 years old or so? No, I'm sorry, Your Honor. I'm suggesting that the circuit court cases, with the exception of the Doe v. Mercy case, which is 2016, by the way, 2017. Right, the Doe case was 2017. The others are older cases for the most part, and those cases were before the Supreme Court and this circuit started moving away from implied causes of action and declining to find causes of action that Congress did not expressly create. I'm sorry. Any further questions? Judge Pooler? I have no further questions. Judge Keirs, any questions? No, thank you. All right. Thank you, Your Honors. Thank you. We'll hear from Counsel for the Department of Education. Thank you, Judge Kapranos. Good afternoon. May it please the Court, Karen Lesperance for the Department of Education. The district court correctly dismissed the claims against the Department of Education based on standing grounds, and respectfully, everything that my adversary said during his oral argument today confirmed all of the reasons why that decision was correct. Dr. Bengelator points to a number of what he calls procedural irregularities, and the failure of the investigators at Cornell to follow the policies that they had in place in terms of not giving him notice of accusations, not allowing him to see evidence, etc. He also points to what he believes to be racial bias by the investigators, and the investigators unfairly discounting witness statements or failing to interview witnesses and consider evidence. None of that conduct, which he points to today as the core conduct which caused his injury, had any relation whatsoever or could be fairly traced to the Department of Education's Title IX regulations. And in fact, he conceded that... Is that possible? I'm sorry, Your Honor? Are you suggesting that the Department of Education's policies on Title IX are irrelevant to anything that went on at Cornell? I'm claiming that they had no role in the claimed injury here. His primary contention with respect to the guidance documents that he challenges is that the 2011 Dear Colleague Letter forced Cornell to change its procedures for how these claims were investigated, changing the evidentiary standard from clear and convincing to a preponderance of the evidence, and not allowing accused to have a hearing in which they cross-examine witnesses. But the fact of the matter is that the investigation against him for violating his relationships policy... Well, let me take a step back. The 2011 Dear Colleague Letter that he claims precipitated this change, that Dear Colleague Letter was focused solely on student-against-student harassment. And to the extent that Cornell changed its policies, to address that guidance from the department, it only changed its policies as to student-against-student harassment. And there is affidavit testimony by the Vice President of Human Resources in the record, the Joint Appendix at pages 245 to 247, which can be fairly considered on a 12C1 motion for subject matter jurisdiction, which the standing analysis is, in which she says that claims against faculty members for sexual harassment and claims against faculty members under the relations policies have always, since its inception in 1996, been adjudicated under a civil investigative standard, which did not allow hearings, did not allow cross-examination, and employed a preponderance of the evidence standard. So nothing changed with regard to how this complaint against Dr. Vengelotor would have been adjudicated based on any of the challenged guidance documents. Moreover, that's the causation element of the standing analysis. To prevail, he would also have to show that his injury would be redressable by the relief that he seeks. The challenge guidance has already been rescinded, and the claim to injury, this damage to his reputation and inability to find a job, primarily because Cornell keeps telling his prospective employers that he was found to have had an inappropriate sexual relationship with his graduate students. A decision, a declaratory judgment by this court that guidance documents that have been rescinded were unlawful or improperly enacted is not going to do anything to address that reputational harm. What will address the reputational harm, if anything, would be the separate claim that he has against Cornell in which he seeks a declaratory judgment expunging the disciplinary finding and not allowing them to disseminate that information to prospective employers anymore. Unless your honors have additional questions, I will rest on my briefs. Judge Kearse, any questions? No questions, thank you. Thank you. I have one question. Are we to assume that with the new administration, the policies will remain the same? No, Judge. We submitted a 28-day letter on this issue, as did Dr. Vengelis. President Biden has already issued an executive order directing the Department of Education to take a look at its Title IX regulations. After this case was filed and while it was being briefed, all of the prior guidance was rescinded. New regulations went into effect in 2020. The executive order from President Biden has directed the Department to take a look at those regulations. And then the Department of Education, just last week, issued another dear colleague letter describing how it is going to implement that executive order. And what it's going to do is go through the formal rulemaking process, issue proposed rulemaking, open it up for public note and comment, and go through that entire process. We don't know and cannot know whether any final rulemaking that comes out of that process will be substantially similar to the prior challenge documents or not, but it will have gone through the rulemaking process and be subject to a challenge under the APA by an appropriate plaintiff at that time, if that is deemed necessary. Well, hold on one second. Let's perhaps... Your brief makes it clear that the so-called guidance documents that are issued did not constitute final agency action under the APA, because they were not actions by which rights or obligations have been determined or from which legal consequences will flow. You don't really suggest that the guidance documents were totally irrelevant here. It's the handling of Dr. Zengler-Torres' matter. Or do you? Well, respectfully, Judge, there is no causal tie between the guidance documents that were issued and anything with... Wait a minute. Wait a minute. There's a lot of literature in the public media, and hundreds of universities were alleged, were reported to have altered their procedures in direct response to the so-called dear colleague letter. And do we know anything about what Cornell did or did not do with respect to the dear colleague letter? There's been no discovery here. Yes, and again, Judge, I would point you to the affidavit from Cornell, pages 245 to 247 of the joint appendix, which can, again, be considered in the context of determining subject matter jurisdiction, in which the vice president of human resources goes through the process of what Cornell did in reaction to that 2011 dear colleague letter. Was the vice president for... What was the exact title? I'll give you the precise title. Did he testify under oath? Was he subjected to cross-examination? No, Judge, it was an affidavit in the record. But on a factual challenge to a standing issue, that can certainly be considered, and then it would be incumbent upon the plaintiff to come up with different evidence establishing otherwise. Certainly, Cornell, as did numerous other educational institutions, all certainly revised their Title IX policies in relation to the guidance. However, the guidance and the changes in policies related to student-to-student harassment and not claims by students against faculty or staff members. And in any event, we're talking now about the Title IX policy. Again, Ms. Roe's complaint was not adjudicated under Cornell's Title IX policy, which Dr. Venglethorst's counsel just conceded during his oral argument, because any claim that she had based on the initial non-consensual act was time barred. And the only process that happened here was under this relationships policy, which is not Title IX, and it was assessing a consensual relationship, and whether or not that was inappropriate for him as a faculty member to be having a consensual relationship with a graduate student that he supervised. So, respectfully, no, the Title IX policies did not come into play in that evaluation, because it was not a Title IX claim that was being adjudicated. And again, the relationships policy has remained unchanged since 1996, was always under the preponderance, and never entitled the accused to hearings and cross-examinations. And Dr. Venglethorst was entitled to all of the same process in 2014, 2015, than he would have been prior to the 2011 Deer Cod League letter, because that was the exact same process that had been in place since 1996 for evaluating the conduct at issue. You're questioning a claim of mootness, is that right? That's correct, Your Honor. The plaintiff has asked for the court to declare the guidance unlawful, but the guidance is no longer in existence. It has all been rescinded. And again, the department has already indicated that there's an ongoing notice and comment period to enact new rules, which would be final rules and subject to an APA review by an appropriate plaintiff. I suppose one might say that the alleged APA and spending clause violations, going back to 2001 through the 2011 Deer Cod League letter, and the 2014 Q&A from the Department of Education, there's a high likelihood that these issues will reoccur, don't you think? Well, again, we don't know what the agency is going to do, because the process has to play out. But if Dr. Venlatore is asking the court, which he seems to be doing, to prohibit the department from issuing similar regulations, then he's asking the court to step in and dictate what the final result of the agency's result must be of that rulemaking process and usurp the rulemaking process of the agency. Better to see what the agency does based on the record that they're currently developing and then evaluate whether or not that's subject to a valid challenge. And in any event, the mootness argument kind of circles back again to the redressability argument. It would not redress the injury that he claims. The reputational harm of Cornell's both finding and disciplining him for and then publishing to other prospective employers the fact that he was found to have an inappropriate relationship with a graduate student cannot be redressed by an injunction by the court. Thank you, counsel, very much. And let's hear from Mr. Klockenberg. Excuse me, Judge Cabanas, I have one more question for the government. Do you have a position that you could share with us on the private right of access issue in Title IX? Unfortunately, I don't have a position that I've been authorized to share with the court on that issue. The department filed an amicus brief in the Third Circuit. But you do not have a position now that you're willing to share or are unable to share? It is correct, Judge. The United States filed an amicus brief in the Doe case in 2016. The United States has never backed off of the position that was articulated in that brief but has not authorized me to state a position with respect to this particular claim and whether Dr. Vengelotor has a private right of action for the claims that he seeks to make in this case. Thank you. Thank you, Judge Cabanas. Thank you very much. Thank you. Mr. Klockenberg? Yes, Your Honor, thank you. And I just want to first focus on the Department of Education's arguments on standing. And I just want to emphasize how fact-bound these arguments are. The department is sort of echoing Cornell's factual assertion about what policy applied or what policy was actually used. And certainly at this stage, we have alleged that policy 6.4 was used and applied. And we have pointed to a number of facts to support that. And it is not up to the court at this point to decide that that's simply incorrect. And I also just want to point out to the department's argument that the Dear Colleague letter had no effect for Dr. Vengelotor, again, that's factually incorrect or we've alleged facts otherwise. As we noted in the brief, policy 6.4 says specifically that it applies to faculty. And policy 6.4 was amended in 2012 in direct response to the Dear Colleague letter. In fact, Cornell said at the time this was in response to the Dear Colleague letter because the former Code of Conduct, quote, did not fulfill requirements of Title IX. And so it is certainly at the pleading stage very clear that the Dear Colleague letter had some effect on the disciplinary process. And certainly part of the claim is that Cornell departed from policy 6.4. But policy 6.4 was also deeply unfair and deeply flawed. And that's, I think, the essence of our argument against the Department of Education. And that came about because of the Dear Colleague letter. And while it's true that those letters have been rescinded now, they were in effect at the time, at the time Dr. Vengelotor went through this process. He suffered that process because of those letters. And particularly since the government is not even willing now to disavow that policy or disavow the possibility of reissuing those same letters, this is a live controversy. And finally, just to briefly touch on the issue of redressability, as other courts have recognized, a declaratory judgment here does have an effect. It does have an effect to say that the policy that Dr. Vengelotor went, that the process he went through, was the product of unlawful government action. And that does go somewhere towards clearing his name, at least enough for standing. And finally, I just briefly want to touch on the issue, on the idea of issue preclusion. I'll note that Judge Sharpe never even passed on this issue. But the reason he didn't is because it's very clearly inapplicable here. None of the New York state courts decided the issues that are actually presented today. Some of those, some related issues were presented to the New York courts. None of the New York judges ever ruled on them. And so issue preclusion just has nothing to do with this case today. Thank you, Your Honor. Thank you very much. Judge Kearse, any questions? No, thank you. Judge Pooler. Judge Pooler? I hope we haven't lost Judge Pooler. She's here, Judge. I see her microphone. I was just trying to speak. I'm sorry to interrupt, Judge, but she's here. I see her connected. Okay. She may be on mute. I have no further questions. Were you asking about me? I was, indeed. I have no further questions. Thank you. Great. So we'll reserve decision in 20-1514.